UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD SUSSBERG,
        Plaintiff,

                                        Case No. 05-70378
        v.                              Judge Avern Cohn

K-MART HOLDING CORPORATION,
            Defendant.
_____/

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. Introduction

This is an employment case.  Plaintiff Ronald Sussberg (Sussberg) was a buyer for Defendant K-Mart Holding Corporation (K-Mart), which operates retail department stores nation-wide.  Sussberg claims K-Mart terminated his employment in violation of the whistle-blower provision of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A et seq., in retaliation for informing his superiors that his supervisor may have been accepting bribes and kickbacks from clothing vendors.  Before the Court is K-Mart's motion for summary judgment.  For the following reasons, the motion will be granted.

### II. Background [1]

Sussberg began working as a buyer for K-Mart in October, 1996.[2]  He was responsible for K-Mart's swimwear and activewear apparel lines during the relevant time

_____

[1] The background is gleaned from the parties' papers.  The parties followed the Court's summary judgment motion practice guidelines but for the following exception: plaintiff did not highlight the relevant portions of exhibits.  For the Court's motion practice guidelines, see http://www.mied.uscourts.gov/_practices/Cohn/motion.htm.

[2] Sussberg received his masters in business administration in the 1970s and worked as a buyer in the clothing industry since the early 1980s.

period.  From the beginning, Sussberg generally received satisfactory performance reviews. However, Sussberg's supervisors noted that he sometimes had strained working relationships with co-buyers and assistants.  For example, Rocco Ingemi, Sussberg's supervisor during the 1999 fiscal year, wrote that Sussberg "meets performance expectations," but commented that Sussberg "must continue to refine his approach with the development of staff.  More patience and sensitivity is needed with staff members that are on a learning curve with new assignments."  Likewise, in his 2001 fiscal year review, Rick Putnam (Putman), Sussberg's manager at the time, commented to Sussberg that: "you need to become more engaged with co-buyers and other support team functions so you understand what they do and what they in turn need from you, " and  " you need to do a better job of leading and informing your team and all support teams," and "need to work on improving morale and motivation of all team members."  Even with these comments, Sussberg's job performance was deemed "effective" overall, and he was rated outstanding in some categories.[3]

**B.**

In May, 2002, Michael Lewis (Lewis), the Vice President of Ladies Wear, became Sussberg's direct supervisor.  Sussberg says that Lewis had a reputation for accepting kickbacks and that at some point Lewis pressured him to buy from Mocean,  a vendor that Sussberg says had previously owned a different company that had gone bankrupt and had failed to fulfill contractual obligations it had with K-Mart.

In September, 2002, Rachel Bradford (Bradford), a K-Mart Human Resources

---

[3] Sussberg's 2000 review contains nothing noteworthy.

Director, called Sussberg and asked him about the leadership in his division because there were concerns about Putnam's performance. Sussberg says Bradford also asked about Lewis' performance during the call. Sussberg says that he told Bradford that Lewis had a reputation for accepting kickbacks and pushing Buyers to purchase apparel from specific vendors who were Lewis' friends even when those vendors had negative reputations. Bradford asked for specific details regarding the allegations; Sussberg provided only third-hand information. Sussberg says that Bradford expressed disbelief at the allegations.

In October, 2002, Sussberg says he followed up with Bradford by asking if she needed additional information on the kickback allegations, but Bradford again expressed disbelief that Lewis had a reputation for accepting kickbacks.

In June, 2003, Sussberg sent an anonymous letter to K-Mart president Julian Day. The letter stated:

> Dear Mr. Day,
>
>> A "heads up" that it is <u>widely</u> believed that Mike Lewis (Ladieswear [sic] is "on the take" (Graft). I would pass along that it has long been common knowledge.
>
>> Please investigate to arrive at your own conclusion.

K-Mart's Director of Investigations, Joseph Sinischo (Sinischo), was assigned to investigate the allegations against Lewis. Lewis had no knowledge of the investigation, and he testified at his deposition that he first learned of the allegations in December, 2004.

Also during the summer of 2003, Lewis prepared Sussberg's fiscal year 2002 performance review. There are three versions of this review in Sussberg's employment

3

file.  Lewis says that the first two versions were drafts.  Lewis says he prepared the first version (Review #1) sometime in late June or early July, 2003, and rated Sussberg "unsatisfactory" in five of the eight categories, and "unsatisfactory" overall.  Lewis says he sent the draft to Bradford who made numerous, undated, hand-written comments on it, including: "retaliation for sending email to JD [Julian Day]...timing...need to get past the email."  Bradford's notes asked Lewis to reduce the number of "unsatisfactory" ratings to three.  Bradford says that she wrote the notes because Lewis had not yet discussed his concerns with Sussberg and she was worried that Sussberg would interpret the negative rating as retaliation for an email Sussberg had written to Bradford and Day relating to K-Mart's polices toward homosexuals.[4]

Lewis says that he prepared a second version (Review #2) incorporating Bradford's suggestions.  Review #2 rated Sussberg "effective" overall, and "unsatisfactory" in three categories.  Bradford made additional comments on this draft and sent an email to Lewis on July 23, 2003, outlining additional recommendations for changes to the review.

The third and final review (Review #3) was completed in August, 2003.  Sussberg received an "effective" rating overall.  Review #3 stated that Sussberg "is not team oriented.  I've received complaints from two key support staff departments and recently have had two co-buyers refuse to work with him."  It further stated that

---

[4] On July 2, 2003, Sussberg sent an email to Bradford and Day about K-Mart's treatment of homosexuals in the workplace.  The email praised K-Mart for including protections in the workplace for homosexuals, inquired about K-Mart's policy towards homosexuals, and mentioned Sussberg's involvement in a group that supports homosexual causes.

Sussberg was viewed as not "having full control of his business," "does not always encourage a team atmosphere," is "very abrupt with support groups and staff," and "needs to be more patient and a better list[e]ner."  Sussberg's rating for "Building Effective Teams" was unsatisfactory.

Sussberg disputes Lewis and Bradford's version of the chronology and says that the first two reviews were prepared in the reverse order.  He says that Bradford was retaliating against him by altering his performance review from "effective" to "unsatisfactory" because he complained to her about Lewis and he sent the anonymous letter to Day.  Sussberg however, admits that he been told that one co-buyer did not want to work with him, but says that he was not given an explanation of the circumstances.  He also says that he knew of another complaint from a computer support person who felt that Sussberg had not gotten data to him soon enough. Sussberg explains that he was short-staffed at that time.

**C.**

Sometime in July, 2003, Sinischo's concluded that Sussberg had likely sent the anonymous letter by comparing the handwriting on the letter with Sussberg's job application after he learned of Sussberg's earlier discussion with Bradford.  In September, 2003, Sinischo interviewed Sussberg.  Sussberg reported that Lewis owned a large boat and a large house in Michigan, was buying a second home in Florida, and possibly had a time-share in Mexico, but admitted that he had no actual knowledge of Lewis' assets or income, and his accusations were based on third-hand information and inferences.  Sussberg mentioned that he had spoken to Bradford about Lewis, but that she had not investigated the allegation.  Sinischo's investigation included a review of

5

Lewis' assets.  He found no evidence of impropriety in Lewis' assets, but Sinischo says that the investigation did raise suspicions.

On or about September 25, 2003, Sinischo met with another buyer, Christine Robertson.  She identified two vendors who were personal friends of Lewis, and discussed an incident which occurred in December, 2002.  Robertson said that one of these vendors put an envelope containing about $2,000 in her purse, but that she returned the envelope after opening it.  Robertson reported that Lewis pushed her to purchase from each of the identified vendors.  Robertson also reported that Lewis ordered another buyer to accept shipments of products from a vendor despite past problems.  There is no evidence Lewis or Sussberg knew of Robertson's statements at the time.

### D.

Around September, 2003, K-Mart adopted a new strategy for its apparel lines.[5] K-Mart decided to design and develop apparel internally rather than purchasing the apparel from outside manufacturers.  The new internally-developed apparel lines changed the role of buyers.  Buyers were required to develop better financial, organizational, and communications skills to oversee every aspect of internal design and production.  Lewis adamantly disagreed with this approach and refused to participate in a September, 2003, meeting in which K-Mart buyers were informed of the new strategy.

On October 7, 2003, K-Mart terminated Lewis for unknown reasons.  Sinischo was not yet finished with his investigation and there is no evidence that the people who

---

[5]K-Mart had filed for Chapter 11 Bankruptcy in January, 2002.

6

discharged Lewis were aware of what Sinischo's investigation had uncovered.[6]
Sussberg believes that there is a connection between Lewis' termination and the
investigation.  He points out that Lewis was discharged just 10 days after Robertson
spoke with Sinischo.

Kathy Douglas was appointed interim director of the Ladies Wear Division.  Day
stated in the announcement that Douglas' integrity, among other things, was a factor in
her appointment.  Douglas, unlike Lewis, supported the decision to develop and design
apparel lines internally.

**E.**

In early 2004, Douglas says she witnessed Sussberg acting impolitely to
co-workers, and began receiving complaints from support staff about Sussberg.
Allegedly a buyer named Kim Waldron told Douglas that Sussberg was too difficult to
work with, and Sussberg's planner, Don Schultz, told Douglas he wanted to move into
another area because Sussberg was difficult and argumentative.  Sussberg says he
never knew of any of these complaints.

Douglas says that around the same time, John Goodman (Goodman), K-Mart's
Senior Vice President and Chief Apparel Officer, told Douglas that he was not
impressed with Sussberg's knowledge of the apparel business.  Goodman says that
he conducted an initial review of Sussberg's 2005 fall line in January, 2004, and
completed a final review of the line in February, 2004.  Goodman says that during both
meetings he felt that Sussberg lacked basic knowledge about the clothing business and

---

[6] Sinischo did not complete the investigation.

depended far too much on his assistant.  In Goodman's opinion, Sussberg was having difficulty fitting in with K-Mart's new internal apparel process.

On February 20, 2004, Douglas met with Sussberg to discuss the new role of the buyers and her concerns about his performance.  Douglas met with all the buyers at this time, and says that the meeting was not meant to be disciplinary.  During the meeting, Douglas says that she told Sussberg that he needed to be respectful and fair in his dealings with coworkers.  Douglas says she also informed Sussberg that he did not have the financial analysis skills to perform in the new buyer role and that Sussberg agreed with her assessment.  Douglas says that she recommended several training courses through which Sussberg could improve his financial analysis skills.

Douglas also completed Sussberg's fiscal year 2003 performance review in or about February, 2004.  This review does not reflect Douglas' or Goodman's alleged concerns.  Sussberg received a rating of "effective" and received a $31,900.00 bonus.  In particular, Douglas commented that,"Ron has made great strides this year focusing on working with all support teams to build a more effective business and team environment."  Douglas explains this discrepancy by pointing out that her review was based on the buyer's old role and self-set goals, not the new roles, and that Sussberg received the bonus based on a pre-set formula.

Goodman says that on March 5, 2004, his personal observations and discussions with Douglas about Sussberg's performance prompted him to schedule a meeting with Douglas and Sussberg for March 9, 2004.  Sussberg says that he talked to Douglas about the reasons for the upcoming meeting, and was told that the meeting was called because Douglas was receiving pressure from support staff about

8

Sussberg's interpersonal skills.  Sussberg says that he asked Douglas if the pressure was coming from Bradford, and that Douglas shrugged her shoulders in response. Sussberg interpreted this gesture to mean that the pressure was coming from Bradford. Sussberg says that he then told Douglas that he had been involved in the Lewis investigation, and that he had complained about Bradford's inaction to Sinischo. Douglas says that this was the first time she learned of Sussberg's complaints about Lewis and the subsequent investigation.  While Douglas says that this news did not affect her since Lewis had been terminated for several months, Sussberg says that Douglas and Lewis were good friends and that he was thereafter subjected to retaliation.  Sussberg says that Douglas became distant and that her attitude towards him changed, though she did not say anything directly to him.

At the March 9, 2004, meeting, Goodman told Sussberg that "he would not make it if he could not get along with people."  Sussberg asked if this sentiment was coming from Bradford because of his involvement in the Lewis investigation, Bradford's resistence to his suggestion that Lewis was taking kickbacks, and his report to Sinischo that Bradford failed to respond to his complaints.  The result of this meeting is unknown, but confirmed Sussberg's involvement in the Lewis investigation to Douglas and Goodman.

**F.**

In late March, 2004, Sussberg traveled to Florida to research competitors' swimwear, design trends, prices, and displays.[7]  Merchandise manager Keith Rothstein

---

[7]  Sussberg went on many research trips each year.

9

(Rothstein) sent Sussberg an email outlining his expectations for the trip.  He instructed
Sussberg to visit several stores, and to purchase mostly returnable samples to provide
direction to K-Mart's swimwear line, and prepare a report to management.  Sussberg
admits that he received the email, but says that he received contradictory oral
instructions from Rothstein and Douglas to cost-conscious and only bring back samples
if necessary.

Sussberg returned from the trip with only two samples (a bikini top and a bikini
bottom).  Douglas considered the samples and the accompanying report to be woefully
inadequate, and both she and Rothstein thought that Sussberg was argumentative and
disrespectful during the meeting discussing the results of his trip.   Sussberg admits that
the format for his report did not satisfy Douglas, but says that he re-prepared the report
to everyone's satisfaction with the new format.

### G.

Douglas says that after the meeting with Sussberg about the Florida trip, she went
to Goodman to discuss Sussberg's performance.  She says that together they decided to
discharge Sussberg because of the failed trip to Florida, his continued inability to respect
co-workers, and the fact that his strengths no longer matched the new job requirements
of the buyer position.  Bradford approved the decision, and Sussberg was discharged on
April 12, 2004.

Sussberg filed a Sarbanes-Oxley complaint with the United States Department of
Labor in June, 2004.   He filed this case on October 4, 2004.

10

### III. Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50.  Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52).  The Court "must view the evidence in the light

11

most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## IV. Analysis

### A. Sarbanes-Oxley Whistleblower Provision.

The Sarbanes-Oxley Act protects whistle blowers of publicly traded companies, by prohibiting employers from discriminating or retaliating against an employee who engages in protected activity under the Act. The Act states:

> (a) Whistleblower protection for employees of publicly traded companies.-- No company with [certain registered securities] or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee--
>
> (A) a Federal regulatory or law enforcement agency;
> (B) any Member of Congress or any committee of Congress; or
> (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or
>
> (2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of the [mail fraud, wire fraud, bank fraud, or securities fraud statutes], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C. § 1514A.

An action under Sarbanes-Oxley is governed by the burdens of proof set forth in 49 U.S.C. § 42121(b).  To establish a prima facie case, the plaintiff must show that (1) he engaged in protected activity, (2) the employer was aware of the protected activity, (3) he suffered an adverse employment action, and (4) circumstances are sufficient to suggest that the protected activity was a contributing factor in the unfavorable action.  49 U.S.C. § 42121(b)(2)(B)(iii); Marshall v. Northrop Gruman Synoptics, 2005-SOX-8, at 3 (A.L.J. June 22, 2005).[8]  A plaintiff must show by a preponderance of evidence that the plaintiff's protected activity was a contributing factor in the unfavorable action.  The employer may avoid liability if it can demonstrate by clear and convincing evidence that it "would have taken the same unfavorable personnel action in the absence of [protected] behavior."  49 U.S.C. § 42121(b)(2)(B)(iv).

Sussberg says he was terminated in retaliation for reporting Lewis' kickbacks, which he says constitutes a violation of federal law relating to fraud against shareholders in violation of Sarbanes-Oxley.  K-Mart makes three arguments in its motion for summary judgment: (1) Sussberg did not engage in protected activity to sustain a claim; (2) Sussberg cannot establish a causal connection between the alleged protected activity and his termination; and (3) K-Mart had legitimate, non-retaliatory reasons for discharging Sussberg.  K-Mart concedes that it was aware of Sussberg's alleged protected activity and that Sussberg suffered an adverse employment action.

The Court recognizes that there is substantial debate but relatively little guidance in the case law (in the way of set principles) regarding the scope of protected activity.

---

[8] In the citation, "SOX" refers to "Sarbanes-Oxley."  Administrative decisions issued by the Department of Labor pursuant to Sarbanes-Oxley make up the "SOX" database.

The Court, however, finds it unnecessary to determine whether Sussberg's activities were in fact protected because even assuming *arguendo* that Sussberg has engaged in protected activity, he has still failed to establish a causal connection between these activities and his termination, as is discussed below.

### B.  Establishing a Causal Connection

### 1.  The Legal Standard

An action under Sarbanes-Oxley is governed by the burden of proof set forth in 49 U.S.C. § 42121(b)(2)(B)(iii).  One of the elements that a plaintiff is required to show is that "circumstances are sufficient to suggest that the protected activity was a contributing factor in the unfavorable action."  A plaintiff must show by a preponderance of evidence that the plaintiff's protected activity was a contributing factor in the unfavorable action.  If the employee does so, the burden shifts to the employer to show by clear and convincing evidence that it "would have taken the same unfavorable personnel action in the absence of [protected] behavior."  49 U.S.C. § 42121(b)(2)(B)(iv).

### 2.  The Parties' Arguments

Sussberg says that he can establish a causal connection between his protected activity and his discharge by showing a pattern of retaliatory conduct that began shortly after the protected activity.  See, Jackson v. RKO Bottler of Toledo, 743 F.2d 370, 377 n.4 (6th Cir. 1984).

It is undisputed that Bradford, Douglas, and Goodman were involved in the decision to terminate Sussberg.  Sussberg says that only Bradford and Douglas actively participated in the decision to terminate him and that both had a motive to retaliate against him for his involvement in the investigation of Lewis.  Sussberg says that

14

Bradford was angry at him for sending the anonymous letter to Day after she dismissed his allegations during their phone conversation, and also because he  complained to Sinischo that she had failed to respond to the allegations.  Sussberg says that Bradford retaliated against him by telling Lewis to change Sussberg's 2002 fiscal year performance review from "effective" to "unsatisfactory" in July, 2003.  Moreover, Sussberg says that it was Bradford's complaints that prompted Goodman and Douglas to hold the March 9, 2004, meeting.  Finally, Bradford approved the request from Goodman and Douglas to terminate Sussberg.

Next, Sussberg asserts that Douglas was angry at him for his role in the Lewis investigation because she and Lewis were close friends.  Sussberg says that prior to his revealing to Douglas that he was involved with the Lewis investigation, Douglas had a high opinion of his work, which is evidenced in his positive review for the 2003 fiscal year.  Sussberg says that it was shortly after she learned about the investigation that Douglas began to complain to Goodman about his performance, and eventually suggested that he be terminated.

Finally, Sussberg asserts that Goodman was not actively involved in the decision to terminate him, and that he simply agreed to terminate him without making any independent evaluation his performance.  Referencing the "cat's paw" theory, Sussberg argues that the bias of a supervisor (here Douglas) who was not the ultimate decision-maker can be imputed to the employer.  EEOC v. International House of Pancakes, 411 F. Supp. 2d 709, 715 (E.D. Mich. 2006)(citing, Wells v. Cherokee Jeep, 58 F.3d 233, 238 (6th Cir. 1995)("courts must consider as probative evidence any statement made by

15

individuals who are in fact meaningfully involved in the decision to terminate an employee.")

K-Mart says that there is no connection between Sussberg's protected activity and his termination.  First, K-Mart argues that the causal connection between the alleged protected activity and an employee's termination can be severed by the passage of time. Halloum v. Intel Corp., 2003-SOX-7, at 12 (A.L.J. March 4, 2004)(a causal connection "may be severed by the passage of a significant amount of time[.]")  K-Mart argues that even if the Court finds that Sussberg did engage in protected activity, the scope of the protected activity is limited to his conversations with Bradford in which he alleged that Lewis was receiving kickbacks, his letter to Day, and his involvement in the Lewis investigation, but does not include his reiteration of his involvement in the Lewis investigation to Douglas and Goodman.  Therefore, K-Mart says that all of Sussberg allegedly protected activities occurred approximately five months or more prior to his termination.  In fact, he had reported the allegations to Bradford some 20 months before his termination.

Next, K-Mart refutes that Bradford or Douglas had a retaliatory motive and argue that intervening events sever the causal connection between Sussberg's allegedly protected activities and his termination. Halloum, 2003 SOX-7, at 12 (a "legitimate intervening event" may defeat any causal inferences that might be premised upon temporal proximity.)  K-Mart says Sussberg's difficulty dealing with co-workers in early 2004[9], Goodman's observations that Sussberg lacked requisite business knowledge,

---

[9]  K-Mart adds that causation is undermined when an employee is cited for poor performance before engaging in protected activity and that deficiency results in discharge.  Hendrix v American Airlines, Inc., 2004-SOX-23, at 19 (A.L.J. December 9,

Sussberg's deficient trip to Florida, and his argumentative and disrespectful treatment of Douglas and Rothstein at the subsequent meeting all legitimately contributed to the decision to terminate him.

### 3.  Resolution

Sussberg has failed to show by a preponderance of the evidence that there is a causal connection between his allegedly protected activities and his termination.  First, while the passage of time is not a conclusive factor, at some point Sussberg's involvement in the Lewis investigation can no longer shield him from being discharged, particularly where there are intervening events.  Here, the Court does not agree with Sussberg that his conversations with Douglas and Goodman, in which he revealed his part in the Lewis investigation, are protected activity.  Sussberg's reiteration of his involvement cannot be said to be related to protecting shareholders from fraud because Lewis had already been terminated for five months.  Therefore, approximately five months had passed since Lewis had been terminated and Sussberg's allegedly protected activities ended.

Second, Sussberg has failed to establish that there exists a genuine issue of fact as to whether he was subjected to pattern of retaliation for his part in Lewis' investigation.  First, there is no evidence that Bradford had a retaliatory motive.  While Sussberg asserts that Bradford encouraged Lewis to give Sussberg a more negative review for the fiscal year 2002, it appears that Bradford in fact encouraged Lewis to give

---

2004).  K-Mart says Sussberg's past performance reviews indicated some performance problems that ultimately contributed to the decision to terminate him.

17

Sussberg a more positive review.  While the three reviews are undated, the review that Bradford and Lewis identify as Review #1 includes five categories in which Sussberg received a rating of "unsatisfactory."  This review has handwritten on it instructions for Lewis to reduce the number of categories rated "unsatisfactory" from five to three, which is reflected in the review Bradford and Lewis identify as Review #2.  Moreover, Bradford's email to Lewis makes additional changes to Review #2 that appear in Review #3.  This suggests that Bradford and Lewis' chronology, not Sussberg's, is accurate because it is independently verifiable.  Moreover, there is no evidence that Bradford knew that Sussberg had complained to Sinischo about her failure to investigate his allegations about Lewis.

Next, Sussberg's contention that Douglas was motivated to complain about Sussberg because she and Lewis were close friends is far too attenuated to create a genuine issue of fact.  Regarding her relationship with Lewis, Douglas merely stated at her deposition that, "I would say that we were friendly, you know, again from talking in halls, talking in meetings, cordial."  She further states that she did not socialize with Lewis outside work, nor did she know if he had any part in evaluating her performance or helping her receive promotions.  In fact, Douglas states that when she and Lewis worked together, "on a day-to-day basis there were frustrations", and "that he did not seem supportive of product development."  Although Douglas says that she (as well as many other employees) was upset when she learned that Lewis was terminated, she attributes her reaction to the sudden manner in which Lewis was fired, and not to their

18

relationship.[10]  Sussberg has grossly exaggerated Douglas' testimony in his briefs and has failed to create a genuine issue of fact about the relationship between Lewis and Douglas.

Moreover, Douglas explained that shortly after she began to supervise Sussberg she witnessed him being rude to co-workers, received complaints about Sussberg from Sussberg's assistant and a co-buyer, and had discussions with Goodman about Sussberg's poor performance.  All of these events occurred *before* Douglas knew about Sussberg's role in Lewis' investigation and refute Sussberg's contention that Douglas had a retaliatory motive.

Third, it is apparent from Goodman's deposition testimony that he was intricately involved with the decision to terminate Sussberg, and that the decision was based on far more than just Douglas' assessment of Sussberg's performance.  In particular, Goodman pointed out two occasions where he felt that Sussberg lacked basic knowledge of the clothing buying business and depended far too much on his assistant for information Goodman believed Sussberg should have known.  The first of these encounters was in Hong Kong, in January, 2004, when Goodman reviewed Sussberg's apparel line for the 2005 season.  Goodman states in his deposition that he felt that Sussberg needed to be more "fashion forward–and the initial costing was not appropriate, and that we needed to ... [put] together a better assortment that was more applicable to the whole store ...".

---

[10]  Douglas states:  "You know, I was upset.  Somebody who I've worked with for many years had to go home and tell his family that he's not employed.  I was upset, and I was upset at how [Lewis' termination] was handled ...just the surprise factor, you know.  I mean I think everybody was a bit shocked."

19

Goodman next met with Plaintiff for the final review of the fall line in February, 2004.

Here, Goodman states,

> I felt that at that time that [Sussberg] didn't seem to have a handle on what we were trying to do in showing the product and didn't have a handle on pricing and was deferring to his assistant buyer at that point and not having a handle on what his strategy was. He wasn't able to communicate what the strategy was, what the margin implications are of the strategy, as well as what does he want to stand for for product, what were his big ideas, how many units was he buying of this, why did he buy this amount of units versus this amount units on this style. Its just that he didn't seem to have a clear blueprint.

Goodman explained that these observations led him to meet with Douglas to discuss Sussberg's performance problems, and then to schedule a meeting with Sussberg himself for March 9, 2004. Furthermore, at some point, Goodman talked to two employees -- Gina Bennet and Kim Waldron, who worked with Sussberg. Both women stated that Sussberg was difficult to work with. It is important to note that these assessments were independent of and prior to Goodman and Douglas' knowledge of Sussberg's complaints against Lewis.

Sussberg says that there is no evidence of any event or incident between his February, 2004, evaluation and his April, 2004, termination. This is not true. As has been discussed, multiple intervening events contributed to the decision to terminate Sussberg, including his inability to get along with coworkers and Goodman's opinion that Sussberg was not performing well in the buyers' new role. Sussberg himself does not dispute K-Mart's contention that the buyers' duties were changing during this time, and his skills may not have suited the new job.

20

Examining the evidence in the light most favorable to Sussberg, a reasonable jury could not find that Sussberg's alleged protected activity was a contributing factor in his termination five months later.[11]

### V. Conclusion

K-Mart's motion for summary judgment is GRANTED.  Even if Sussberg did engage in protected activity, there is no causal connection between the alleged protected activity and his termination because significant time had passed and intervening events could reasonably justify K-Mart's decision to terminate him.

SO ORDERED.


 s/Avern Cohn                                        
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  November 15, 2006


I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, November 15, 2006, by electronic and/or ordinary mail.


 s/Julie Owens                                 
Case Manager, (313) 234-5160

---

[11]  Because Sussberg has failed to establish a causal connection, it is unnecessary for the Court to examine whether K-Mart can show by clear and convincing evidence that it would have terminated Sussberg regardless of its knowledge of Sussberg's complaints about Lewis receiving kickbacks.